No. 13011

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

THE STATE OF MONTANA,

> Plaintiff and Respondent,

vs.

DUNCAN PEDER McKENZIE, JR.,

> Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District, Honorable R. J. Nelson, Judge presiding.

Counsel of Record:

For Appellant:

> Barney Reagan argued, Cut Bank, Montana

For Respondent:

> Hon. Mike Greely, Attorney General, argued, Helena, Montana
> Michael McCarter, Assistant Attorney General, argued, Helena, Montana
> Douglas Anderson, County Attorney, argued, Conrad, Montana

---

Submitted: March 13, 1978

Decided: JUN - 7 1978

Filed: JUN - 7 1978

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Duncan Peder McKenzie, Jr., was convicted of the crimes of deliberate homicide and aggravated kidnapping by jury verdict in the District Court of Cascade County and thereafter was sentenced to death. The conviction and sentence were affirmed on appeal by this Court. State v. McKenzie, (1976), ____ Mont. ____, 557 P.2d 1023, 33 St.Rep. 1043.

Thereafter, the United States Supreme Court granted certiorari, vacated this Court's judgment and remanded the cause to us for further consideration in light of Patterson v. New York, (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L Ed 2d 281. This opinion constitutes the judgment of this Court following remand.

The victim in this case was Lana Harding, a 23 year old rural school teacher in Pondera County, Montana. On Tuesday morning, January 22, 1974, she failed to appear at school. At the Pioneer School teacherage where she lived, the bed was found in a dishevelled condition. The sheriff of Pondera County was called and officers were dispatched to the school, arriving there mid-morning.

Investigation that day revealed: (1) A red tennis shoe belonging to Lana Harding just outside the school; (2) a drag trail from the teacherage to a nearby road; (3) blood near the end of the drag trail (later identified as Lana's type and Rh factor); and (4) a wristwatch belonging to Lana in the same area as the blood. Lana Harding was last seen in Conrad, Montana, some 13 miles from the teacherage, on Monday, January 21, at about 5:00 p.m.

Defendant had recently moved into the community and was working for the K & K Wholesale Seed Co. located approximately three miles from the Pioneer School teacherage. A day or so before January 21, he made arrangements to buy a 1948 black Dodge pickup, recognizable to most inhabitants of the area because it had belonged to one local owner for a long period of time. On January 21, defendant had worked on the pickup after work. He was seen leaving K & K Wholesale Seed Co. at approximately 6:45 p.m., heading toward his place of residence (not far from the teacherage) in the black pickup. The pickup was seen about 7:00 p.m. about a mile from the teacherage.

Approximately an hour later, around 8:00 p.m., defendant knocked on the door of the Pearson farm residence, located across the road from the teacherage. He asked for assistance in starting his pickup. It was later determined the pickup was parked in the road at a point where the drag trail ended and where the blood and watch were found the following day. At the Pearson residence defendant asked directions to his own residence and called his wife to say he was coming home. Don Pearson pulled the pickup, got it started, and noted defendant did not drive on toward his place of residence. Shortly thereafter, the pickup was seen being driven toward the drill site where Lana's body was found the following day.

Her body was found clothed only in a shirt, sweater and bra. It was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow had been delivered to the head and laid open the right side. A rope was tied around her neck; there was

evidence she had been strangled; however, pressure had been released so she did not die of strangulation. A coil of wire was entangled in her hair, later shown to have come from a roll of wire found in the back of defendant's pickup.

During the search for the body and the investigation of the homicide, three additional items were found: (1) A pair of gloves, worn by defendant at work, were found in a field not far from where the body was discovered with human blood on them; (2) overshoes with Lana's type blood and brain tissue on them were found about a quarter of a mile away, and impressions from the soles matched the heels of boots later taken from defendant's home; and (3) Lana's purse was found near the place where the overshoes were recovered.

As a result of the investigation by the sheriff and his deputies, the county attorney, on Tuesday afternoon, January 22, filed a complaint charging defendant with assault before the justice of the peace. The county attorney also obtained a warrant for the arrest of defendant and a search warrant.

Defendant was thereafter arrested at his home. The black Dodge pickup was seized and impounded. Human blood was found in the bed of the pickup and on the springs; the back end of the pickup had been recently sprayed with black paint; the spray paint was later identified by FBI experts as identical to a paint brand named "Weekend" which was not available in the Conrad, Pondera County, area. A can of the black spray paint was found in the cab of the pickup, and another was later found at defendant's home.

The following items were found in the back of the pickup: (1) A coil of wire, later identified as having been the source of the wire found in the victim's hair; (2) an exhaust manifold that had been painted black; and (3) human

blood of the same type and Rh factor as Lana's and brain and cortical tissue were found on the manifold. Dr. John Pfaff, who examined the victim's body and the manifold, testified that the manifold could have inflicted the fatal blow.

At the drill site where the body was located, a piece of brass from a water pump was found. The prior owner of the Dodge pickup testified this piece of brass was in the back of the pickup when defendant took possession of the pickup on January 19.

Several co-workers at the K & K Wholesale Seed Co. testified at trial that defendant had said on January 21 that he broke in every new vehicle by engaging in sexual intercourse in each newly acquired vehicle. Several days before defendant had remarked that he had had intercourse with country school teachers; that they were naive, he could teach them, and they were easy to get.

Defendant appealed from the judgment of conviction and sentence imposed. We affirmed. State v. McKenzie, supra. The United States Supreme Court, on certiorari, vacated this Court's judgment and remanded the cause to us for further consideration in the light of Patterson v. New York, supra.

We have reconsidered the entire case, not only in the light of Patterson, but also on all issues raised in the original appeal to this Court. This opinion constitutes this Court's judgment in the entire case following remand.

In the interest of an orderly presentation of the specifications of error raised by defendant, we reorganize and present them insofar as possible in chronological sequence. Although there is some overlap, the issues on appeal generally fall into four categories: (1) Those relating to pretrial proceedings; (2) those involving the trial itself; (3)

issues involving post-trial proceedings, including but not limited to, imposition of the death sentence; and (4) issues for reconsideration as remanded from the United States Supreme Court.

Defendant's specifications of error on appeal are:

1. The issuance and execution of the arrest and search warrants without probable cause, including all claims of error flowing therefrom.

2. Errors relating to the District Court's refusal to permit defendant to change his plea and enforce a plea bargain.

3. Denial of defendant's motions for substitution of the trial judge.

4. Permitting the filing of amended Informations against the defendant and matters relating thereto.

5. Denial of a speedy trial to defendant.

6. Denial of defendant's motions for a protective order and the constitutionality of Montana statutes relating thereto.

7. Denying defendant the right to voir dire the jury on legal concepts relating to defendant's mental state.

8. Permitting the State to endorse 58 additional witnesses on the amended Information on the first day of trial.

9. Failure of the State to timely furnish defendant with statements of its witnesses.

10. Improperly admitting in evidence numerous State's exhibits and denying admission in evidence certain proposed exhibits of defendant's.

11. Improperly instructing the jury.

12. Improper jury verdict forms.

13. Permitting audience recording of the State's closing argument to the jury.

14. Undue interference and partisan attitude by the trial court preventing an orderly and proper presentation of the case.

15. Insufficiency of the evidence to support the verdict.

16. Denial of defendant's motion for a new trial.

17. Errors in the court's "findings, conclusions, sentence and order" resulting in the imposition of the death sentence.

18. On remand from the United States Supreme Court, the issue is whether the trial court's instructions improperly shifted the burden of proof of defendant's state of mind, an essential element of the crimes charged, to defendant in violation of due process under the federal and state constitutions.

In connection with the first issue above, defendant contends: The arrest and search warrants were not issued upon probable cause in violation of United States and Montana constitutional requirements; the facts supporting probable cause were not made under oath or affirmation and reduced to writing in violation of Montana constitutional requirements; the search warrant was either issued as or converted into a prohibited general search warrant; section 95-1806(f), R.C.M. 1947, is unconstitutional under the United States and Montana Constitutions; by reason thereof State's exhibits 17, 18, 20, 21, 22, 26, 27, 31, 32, 33, 34, 35, 39 through 52, 83 through 100, and sublettered exhibits bearing any of these numbers are inadmissible as the products of an unlawful search and seizure; and defendant's motions to suppress and objections to these exhibits should have been granted.

We disagree with defendant's contention there was no probable cause for the arrest or search warrant. This Court in State ex rel. Garris v. Wilson, (1973), 162 Mont. 256, 511 P.2d 15, considered federal case law and the long standing rule in this jurisdiction on probable cause for arrest and search warrants noting:

> "'We reach this decision by application of the following standards: only a probability of criminal conduct need be shown.'"

Far more was shown here. See: State v. Troglia, (1971), 157 Mont. 22, 482 P.2d 143; Spinelli v. United States, (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

Defendant argues the search warrants must fall on the basis of failure on the part of the county attorney to swear or affirm and reduce the testimony to writing. He relies on State ex rel. Townsend v. District Court, (1975), 168 Mont. 357, 543 P.2d 193; and Petition of Gray, (1970), 155 Mont. 510, 473 P.2d 532. We find neither case factually applicable here.

Article II, Section 11, 1972 Montana Constitution, provides:

> "* * * No warrant to search any place, or seize any person or thing shall issue * * * without probable cause, supported by oath or affirmation reduced to writing."

In Townsend nothing was reduced to writing. Here, there is an affidavit signed by the county attorney and made a part of both warrants. At a later date, defendant argues the justice of the peace failed to follow the rituals of the swearing. County Attorney Nelson later testified he asked the justice of the peace "if he was sworn."

Defendant argues the county attorney made the affidavit only on facts obtained from Jerry Hoover, a deputy sheriff of Pondera County, who had been at the scene of the crime as

part of the investigating team. This is not a true picture of what took place before Justice of the Peace Wolfe at the time the county attorney gave the affidavit and obtained the warrants.

On September 30, 1974, a hearing on the defendant's motion to suppress was held before Judge Robert J. Nelson. Testifying were Sheriff Hammermeister, his deputy Jerry Hoover, Justice of the Peace Robert Wolfe and County Attorney David H. Nelson. The arguments of defendant's counsel were directed to the lack of probable cause for the issuance of the warrants.

A summary of the testimony shows Justice of the Peace Wolfe testified he customarily swears all witnesses though he did not recall swearing in the county attorney, he considered him sworn. Deputy Hoover testified he came into town about 4:30 p.m. on January 22, 1974, with directions to go to the county attorney's office; that he helped the county attorney prepare the affidavit and he then went before Justice of the Peace Wolfe and gave sworn testimony in support of the issuance of the warrants. County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get the warrants issued. At the hearing, he said in answer to a question as to what knowledge he had of the facts:

> "A. Well, without looking at the affidavit
> now--I think the first paragraph or two is my
> statement as to what I determined, that she
> was missing and may have been the victim of
> foul play but of what nature we didn't know at
> the particular time, and that she resided at
> the teacherage."

In addition, the county attorney examined Deputy Hoover before the justice of the peace as to facts he learned

during the investigation. Here, unlike Gray, there was, in effect, sworn testimony by the county attorney and deputy sheriff in addition to the affidavit, and the combination thereof established probable cause. The fact that defendant had been parked at the roadside near the school the night before had been established by the Pearsons, who assisted defendant in getting the truck moved. It was there the victim's watch was found in a pool of blood by the investigating officers before going to town to get the warrants. See: Lindley v. State, (1956), Okl.Cr., 294 P.2d 851.

This, in our opinion is a sufficient showing of probable cause to issue the warrants.

Defendant next attacks the specificity of the search warrant, alleging that under the search warrant issued, a blanket seizure resulted. Examination of the warrant indicates that both the house and the vehicle were to be searched. Though an error on the vintage of the black Dodge pickup (1950 instead of 1948) appeared, that is of little significance. State ex rel. Flournoy v. Wren, (1972), 108 Ariz. 356, 498 P.2d 444. All parties knew the pickup involved. All that is needed to meet the requirements of specificity is that the officer with reasonable effort, can ascertain the automobile intended to be searched, and its owner, if possible. Wangrow v. United States, (8th Cir. 1968), 399 F.2d 106. Defendant cites case authority that some seven criteria are needed for identification of a motor vehicle-- owner, make, model, year, color, motor number and license number. Here, the affidavit for the search warrant answers five of the seven listed criteria and it was sufficiently specific. Wilkerson v. Commonwealth, (1923), 200 Ky. 399, 255 S.W. 76; Hatley v. State, (1941), 72 Okl.Cr. 69, 113 P.2d 396.

-10-

Defendant's argument that the items seized were not covered by the language "any other contraband articles" is without merit. The language used comes within the rule of State v. Quigg, (1970), 155 Mont. 119, 467 P.2d 692, where we held that items other than those specifically described in the search warrant may be seized as long as a reasonable relationship is demonstrated between the search authorized in the warrant and seizure of the items not specifically described therein.

Next we consider the constitutionality of section 95-1806(f), R.C.M. 1947, which states:

"The burden of proving that the search and seizure were unlawful shall be on the defendant."

We find no merit in defendant's contention this subsection is unconstitutional. We note defendant cites no authority for his position and therefore fails to overcome the presumption of constitutionality. United States v. Keleher, (1924), 55 App.D.C. 132, 2 F.2d 934, relied upon by defendant, is not applicable to the facts here. We note that Montana's statute section 95-1806(f), R.C.M. 1947, is patterned after Chapter 38, §114-12(b), Ill.Code of Criminal Procedure, which states in part:

"* * * The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant * * *."

Here, such a hearing was held by the trial court, and defendant failed in his effort. People v. Normant, (1975), 25 Ill.App.3d 536, 323 N.E.2d 553; State v. Tritz, (1974), 164 Mont. 344, 522 P.2d 603.

Defendant next specifies reversible error arising out of an alleged "plea bargain", an alleged breach thereof by the State, a refusal by the District Court to specifically

-11-

enforce the terms thereof, and a refusal by the District Court to permit the defendant to withdraw his prior plea and substitute a plea of guilty in conformity with the alleged plea bargain.

In substance the defendant contends that a valid and binding agreement was made on December 22, 1974, between the prosecutor and defense counsel, subject to approval by the trial judge, that defendant would plead guilty to deliberate homicide and aggravated assault and would receive sentences of 50 years and 20 years respectively to be served concurrently. Defendant claims that on the following day counsel met with the trial judge, who with some reluctance, agreed to all aspects thereof (except that he felt he could only give one 50 year sentence for both crimes) and set December 30 as the date for change of plea and entry of judgment in accordance with the agreement. As a result, according to defendant, defense counsel agreed to explain what problems they foresaw in the prosecution of the State's case and what the defense position would have been had the case gone to trial, all to counteract anticipated public reaction by the sheriff and the family of the victim.

On December 28 the prosecutor advised defense counsel they would not perform their part of the plea bargain agreement, according to defense counsel. On December 30 the District Court denied defendant's motion to withdraw his plea and refused to enforce the alleged plea bargaining agreement.

The State, on the other hand, denies that any plea bargaining agreement was entered into on December 22, or at any other time. The State contends the initiation and impetus for the plea bargaining discussions came from the defendant;

that throughout the discussions the State consistently took the position that no plea bargain could be entered into without the consent of the victim's family and the sheriff; and that the only reason the State agreed to meet with the trial judge and defense counsel on December 23 was that the prosecution was unable to travel some 400 miles to see the victim's family until December 26. Because no consent could be obtained from the victim's family, no further plea bargaining discussions were held. The State asserts any gratuitous information that defense counsel believed they had imparted to the State was either already known to the State or of no significance to the prosecution's case.

This issue turns on the existence of the alleged plea bargaining agreement. The trial judge accepted the State's version of the situation and refused to enforce the alleged agreement contended for by defendants. We likewise accept the State's version. We hold that where, as here, the existence of any plea bargaining agreement was disputed and there is substantial evidence that none was made, there is nothing to enforce and the trial court's actions in this regard were correct.

As we understand it, there is neither contention nor proof of bad faith by the State in its discussions with defense counsel on a plea bargain or in its effort to secure the approval of the sheriff or the victim's parents. Under these circumstances any statements of defense counsel concerning weaknesses in the State's case or defense positions in connection therewith were gratuitous and premature. In any event, a trial is not a sporting contest in which the verdict turns on nondisclosure of such matters. Discovery procedures are designed and operated to remove this element

and had been extensively and exhaustively utilized at the time in question.

Santobello v. New York, (1971), 404 U.S. 257, 92 S.Ct. 495, 30 L Ed 2d 427, does not aid the defendant here as that case is clearly distinguishable on the facts and on the law.

Defendant's next specification of error concerns the denial of his motions for substitution of the trial judge. He argues that he attempted to disqualify the trial judge for cause by motion and hearing on September 30, 1974, on the basis that the trial judge was a member of the Criminal Law Revision Commission that drafted Montana's present Criminal Code and submitted it to the legislature for enactment. He argues that he again attempted to disqualify the trial judge for cause on December 30, 1974, first, because the trial judge had acquired information during the plea bargaining process making it impossible for him to sit in an impartial manner, and second, because he was attempting to force his own "Preliminary Instructions to the Jury" over both prosecution and defense objections which indicated he had assumed an adversary stance and taken over prosecution of the case.

We hold that the trial judge's membership on the Criminal Law Revision Commission did not per se constitute grounds for disqualification for cause. Canon 4 of the American Bar Association Canons of Judicial Ethics specifically permits this: "A Judge may engage in activities to improve the law, the legal system, and the administration of justice." The draft of the revision of the Criminal Code by the Commission was presented to the legislature for its consideration, approval, rejection or modification.

-14-

Nor do we find any ground for disqualification of the trial judge for cause in his acquisition of information during the plea bargaining process, his drafting of "Preliminary Instructions to the Jury", or any facts or proof that he had assumed an adversary position at trial in taking over the prosecution of the case. The rule of United States v. Grinnell Corp., (1966), 384 U.S. 563, 86 S.Ct. 1698, 16 L Ed 2d 778, is inapplicable to establish bias and prejudice. Here, whatever knowledge the trial judge obtained was during the course of legal proceedings in the case and not from any outside source. As long as the trial judge's "Preliminary Instructions to the Jury" are a correct statement of the law, it is immaterial whether they are drafted by the judge or given over the objections of one or both adversary counsel. Such is the case here for reasons hereafter discussed. Finally, we find the record does not support defendant's contention the trial judge assumed an adversary role and took over the prosecution of the case.

Defendant argues as error the District Court's rulings permitting the State to file amended Informations against him. We need only concern ourselves with the filing of the third amended Information as it was this Information on which defendant was ultimately tried. The third amended Information conforms to our opinion and directions in State ex rel. McKenzie v. District Court, (1974), 165 Mont. 54, 525 P.2d 1211. Thus, there is no error in the affidavit, the Information, or the District Court's rulings in permitting its filing.

Defendant complains he was denied a speedy trial, emphasizing a lapse of 350 days between arrest and trial. This delay cannot be considered per se a violation of

-15-

defendant's right to a speedy trial. However, the length of time between defendant's arrest and trial does shift the burden of explaining the reason for the delay and showing absence of prejudice to defendant upon the prosecution. Fitzpatrick v. Crist, (1974), 165 Mont. 382, 528 P.2d 1322; State v. Keller, (1976), ____ Mont. ____, 553 P.2d 1013, 33 St.Rep. 795. The State's explanation for the delay was defendant's several appearances in this Court, the difficulties arising from the defendant's refusal to plead, and the difficulties which arose because this was the first homicide prosecuted under the new Montana Criminal Code and under the new capital punishment scheme. Much of the time can in fairness be charged to neither party, but it is clear that it aided both parties to better prepare for trial, this being a complex circumstantial case. Under those circumstances, we cannot see that defendant was denied his right to a speedy trial. The State's explanation of the delay is satisfactory and shows that defendant was not prejudiced by the length of time between arrest and trial.

Defendant contends the Montana provision for notice of mental defect or disease and the mental defect or disease provisions in the Code of Criminal Procedure, sections 95-501 through 509 and section 95-1803(d), R.C.M. 1947, are unconstitutional. To challenge the constitutionality of these sections, defendant sought a protective order to protect himself from any waiver of rights were he to give the notice required by these sections. The court denied the relief sought and held these sections to be constitutional and not violative of the United States or Montana Constitutions. On appeal, defendant maintains the court erred in not holding these provisions unconstitutional.

Defendant's constitutional arguments were previously answered by this Court in State ex rel. Sikora v. District Court, (1969), 154 Mont. 241, 462 P.2d 897. Defendant's attack on these statutes loses much of its force when it is recognized that the United States Supreme Court promulgated, and Congress, after careful consideration, approved Rule 12.2, Federal Rules of Criminal Procedure, Notice of Defense Based upon Mental Condition, which is nearly identical to the procedure attacked here. It should be emphasized that the purpose of the statute is for notice, to prevent surprise, and to eliminate the necessity for a continuance of a trial when the defense is raised. The fact of notice does not amount to a plea, and it could not be used in any way as evidence in a trial on the merits. The provisions merely provide for advance notice of the intent to rely on such defense so that the State may be prepared to meet this defense.

Defendant claims prejudice because he was not allowed to voir dire the jury on the subject of mental disease or defect. This Court has previously said that where notice of a defense of mental disease or defect is given, a refusal to allow defendant to voir dire the jury on this defense constitutes prejudicial error. State v. Olson, (1971), 156 Mont. 339, 480 P.2d 822. Here, defendant did not give any notice. We believe defendant was properly not allowed to voir dire the jury on mental disease or defect as he did not give any notice of this defense.

Defendant also alleges the addition of the names of 58 new witnesses to the amended Information on the day of trial was error.

The pertinent section of the Code of Criminal Procedure

is section 95-1803(a)(1), R.C.M. 1947, which reads:

"(a) List of Witnesses:

"(1) For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court at the time of arraignment, a list of the witnesses intended to be called by the prosecution. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses, upon a showing of good cause. The list shall include the names and addresses of the witnesses."

The Revised Commission Comment on this section points out:

"Section 95-1503(d) of Chapter 15 requires the state to endorse the names of the witnesses for the state on the indictment or information. The motion under this section permits the defendant to get a list at any time, probably after arraignment and before trial. Many times the state does not know before it files the indictment or information all the witnesses it may call.

"Further, this provision allows the addition of names not only prior to trial, but after the trial has commenced. As the trial progresses, the showing which is necessary to establish 'good cause' should be more stringent. At any time, the judge may allow a continuance (section 95-1708) if it should appear necessary in the interest of justice."

In State v. Campbell, (1972), 160 Mont. 111, 500 P.2d 801, the person whose name was added was the victim of the assault and the Court there found no serious claim of surprise and pointed out that while defendant objected, he made no effort to ask for a continuance. In State v. Rozzell, (1971), 157 Mont. 443, 486 P.2d 877, the District Court judge recognized the possibility that the witnesses added would surprise the defendant and offered to continue the trial until the defendant had had a chance to interview all the new witnesses, but this was refused.

These cases clearly indicate that the proper procedure where surprise is claimed from the addition of new witnesses is to ask for a continuance so that defendant may prepare.

In the present case, defendant objected to the addition of the witnesses based on surprise and inability to prepare his defense, but never requested a continuance. The District Court in granting the State's request for the addition of the new witnesses cautioned:

> "* * * and in granting this motion, it must be understood before any of these witnesses is allowed to testify, the defendant must be given an opportunity to have his counsel talk with them, examine them * * *."

The witnesses added were not prejudicial to defendant. The addition of the names of the FBI agents did not surprise defendant, as he knew the content of their testimony from reports received several months earlier. The rest of the additional witnesses who were actually called to testify were employees of Wright Chevrolet. These persons' testimony was a part of the chain of possession of the evidence seized from the truck. The remainder of the witnesses whoses names were added, but who were not called to testify, were named because they could, if need be, corroborate the testimony of the already listed witnesses, lay further foundation, or testify about the weather and temperature in the area on the dates in question.

In its order the court was careful to provide defendant with protection against surprise and to ensure that defendant was able to prepare for the testimony. Defendant was in no way prejudiced by the addition of these witnesses. Before allowing the addition of the new witness names, the court examined the county attorney to determine the reason for the addition of each new witness and to find out the nature of each of the witness' testimony in the presence of defendant's counsel, so that defendant was apprised of the basic nature of the testimony.

Defendant contends the State failed to timely furnish him with statements of its witnesses. He argues that this is reversible error.

Sections 95-1801(d)(1), (d)(2) and 95-1804(a), R.C.M. 1947, provide the basic discovery tools. Section 95-1804(a), R.C.M. 1947, provides:

"On motion of a defendant in any criminal case made prior to trial the court shall order the state to furnish the defendant with a copy of any written confession or admission and a list of the witnesses to its making. If the defendant has made an oral confession or admission a list of the witnesses to its making shall be furnished."

This section by its mandatory language entitles defendant, as a matter of right upon motion, to statements he made. It requires no showing of good cause.

Section 95-1801(d)(1), provides:

"Upon motion of either party and upon showing of good cause, the court may issue a subpoena prior to the trial directing any person other than the defendant to produce books, statements, papers and objects before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and the court may, upon their production, permit the books, statements, papers or objects or portions thereof to be inspected, copied, or photographed by the parties and their attorneys."

The Revised Commission Comment discussing this section points out:

"The discovery allowed under subsection (d) is a two-part mechanism for gathering information. Under paragraph (1) either party may require a third person, other than the defendant, through the use of a subpoena (section 93-1501-3), to produce certain articles. The only restriction is that good cause must be shown. This allows what is sometimes referred to as a 'fishing expedition'--but only where third parties are concerned."

Section 95-1801(d)(2), provides:

"Upon motion of the defendant, within a reasonable time before trial, the court may, upon a showing of good cause, at a time and place designated by the court, order the prosecution

-20-

> to produce prior to trial for inspection, photo-
> graphing or copying by the defendant, designated
> books, statements, papers, or objects obtained
> from the defendant or others by the prosecution
> which are material, relevant and necessary to
> the preparation of the defendant's case."

The Revised Commission Comment discussing this provision

states:

> "The second paragraph permits discovery by the
> defendant or the prosecution with the additional
> requirement that the object desired must be
> 'material, relevant and necessary to the pre-
> paration of the case.'"

This comment indicates the showing necessary to get access

to material in the hands of the prosecutor is greater than

that required to get material in the hands of third parties.

Against this background, and with the recognition that

in most criminal cases in Montana discovery is conducted on

a more informal basis without resort to the motion and

hearing procedures outlined above, this Court finds the

allegation of error based on a delay of approximately one

week in complying with the demand made by defendant after

trial had begun, to be without merit.

Defendant claims he had made two prior demands upon the

county attorney for this material. These demands were in

the form of letters to the county attorney. Defendant made

a number of specific requests and then made a general request

for "* * * copies of any documentary or physical items which

you will rely on for proof of any fact * * *." The second

letter expressed defense counsel's opinion that the State

was not going to provide the requested information. This

letter was dated August 20, 1974. On January 13, 1975,

after trial began, defendant filed a demand and motion

requesting that all statements taken by the prosecution from

all witnesses be turned over to defendant and demanding

immediate compliance. Any delay in the prosecution's fur-

-21-

nishing defendant with the material requested in his earlier letters was waived by defendant's failure to file a demand and motion for this material until after trial had begun.

Even though the demand and motion was not made "within a reasonable time before trial", as required under section 95-1801(d)(2), the court granted the motion saying:

> "Before a witness takes the stand, other than your foundation witnesses, that you [the State] are proceeding with now, furnish them [defense counsel] with such copies as you have that are not your work product as such, and before they [the witness] take the stand, he is going to be given an opportunity to talk with each witness, particularly those that have been endorsed just the other day * * *." (Bracketed material added.)

The time it took for the State to gather, sort, and copy the requested material during the presentation of the State's case-in-chief was reasonable. The court prevented any prejudice by allowing defendant to interview the witnesses prior to their taking the stand. We note the State complied with the specific requests made by defendant in the August letters, and the reports received from the FBI and the autopsy report were forwarded to defendant soon after they were received and prior to the August requests.

Defendant objects to certain photographs which were introduced into evidence as being gruesome and inflammatory or otherwise prejudicial.

The basic rule on photographic evidence in Montana as stated in State v. Campbell, (1965), 146 Mont. 251, 261, 405 P.2d 978, 984, is:

> "* * * Photographs are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P.2d 1025. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any fact, it should be excluded. State v. Bischert, 131 Mont. 152, 308 P.2d 969 * * *."

Here, the photographs in question fall into three categories:
(1) Photographs of the body taken at the "drill site"; (2)
autopsy photographs taken by the pathologist; and (3) a
single photograph of a can of spray paint in a suitcase.

In each instance these photographs meet the above test.
They were relevant, useful, and necessary in explaining the
evidence and assisting the court and jury in understanding
the case. (1) The photographs taken at the site where the
body was found were used by the pathologist to show creases
in the body which were not present after the body had been
moved and which tended to show how long the body had been at
the site. (2) The autopsy photographs, taken in color and
then printed in black and white, were used by the pathologist
to show the nature of the wounds and explain the evidence
which formed the basis of his opinion as to the size and
configuration of the weapon which was used to inflict the
wounds. (3) The photograph of the can of spray paint in the
suitcase was used to show the defendant had in his possession
a type of paint which was not available in local stores.
Defendant finds prejudice from this photograph in the impli-
cation of flight that could arise from the fact the paint
was in a suitcase. However, defendant had been in custody
for some time prior to the time these photographs were
taken. This alleged prejudice could have been easily ex-
plained away in cross-examination. There was no intent to
excite feelings with this photograph which was in no way
gruesome. It was properly admitted.

Defendant also objects that certain expert opinion was
allowed to be given prior to the completion of the chain of
possession of the evidence upon which this opinion was
based. This opinion evidence was given by FBI agents who

were witnesses for the State. The judge allowed them to give their opinion as to the evidence they had examined, which had not as yet been admitted in evidence, because there was a portion of the chain of possession which had not been established. It is within the discretion of the court to allow opinion to be given, conditioned on the subsequent production and admission of the evidence which forms the basis of the opinion. Risken v. Northern Pac. Ry., (1960), 137 Mont. 57, 350 P.2d 831; Graham v. Rolandson, (1967), 150 Mont. 270, 435 P.2d 263. The chain of possession of the evidence was later supplied. Thus no error was committed.

Next defendant complains that a number of his proposed exhibits were refused admission into evidence. Our examination of the record reveals that these exhibits were refused on the basis of a lack of a proper foundation. The rule is that the determination of whether a proper foundation has been laid for the introduction of exhibits into evidence rests with the trial court, and its determination will not be overturned on appeal unless there is a clear abuse of discretion. State v. Olsen, (1968), 152 Mont. 1, 445 P.2d 926. In this case, we cannot say the trial court abused its discretion in not admitting defendant's exhibits into evidence. Defendant's argument is without merit.

Defendant contends the extensive preliminary instructions given by the court were erroneous, that it was error to give them prior to the introduction of evidence, and that the remaining instructions given after the presentation of evidence were wrong.

The preliminary instructions were the usual instructions given on the role of the jury. In addition, included were a number of instructions which set out the elements of the

various crimes of which defendant was accused, and set out statutory definitions of terms used.

Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury. There was no error in incorporating the entire Information into the preliminary instructions, for it too is basically in statutory language merely inserting defendant's name and the victim's name in the proper places and enumerating the weapons used. The language is not inflammatory but is as neutral as language detailing the charges involved here can be. Examination of the instruction defining reasonable doubt and the burden of proof show proper statements of the law.

Defendant asserts that language in the instruction which defines the degree of proof necessary as being that which convinces the mind "to a moral certainty of the truth of the charge, no more and no less" falls into the type of error found in State v. Taylor, (1973), 163 Mont. 106, 515 P.2d 695. In Taylor, the State's burden was defined using the phrase "only such proof as may" which impliedly limits consideration of some of the evidence and which could be interpreted to limit the burden of proof. Here, the nature of the subjective judgment to be made by the jurors is set forth, and the language "no more and no less" merely emphasizes the nature of the judgment and in no way diminishes it.

The Court finds no error to the prejudice of defendant from the fact that extensive preliminary instructions were given prior to the introduction of evidence in the case. Defendant concedes that section 95-1911, R.C.M. 1947, gives the court the power to vary the order of trial set out in section 95-1910, R.C.M. 1947, for good reasons. The present

case was built entirely on circumstantial evidence. Some of the counts charged were complex and difficult to understand. For example, the second homicide count was a felony homicide which had as alternative felonies, sexual intercourse without consent and aggravated assault. The aggravated assault alternative had alternate aggravating factors, serious bodily injury or bodily injury with a weapon, and a listing of alternative weapons, a rope or a heavy object. It was for good reason that the judge instructed the jury as to the basic elements of all the offenses charged, so the jury could have some understanding of the complex circumstantial evidence to be presented. In a less complex case which was not based only on circumstantial evidence, such preliminary instructions might not be necessary and there would not be the required good reasons for varying the usual order of the trial, but here it was acceptable to do so.

One of the preliminary instructions to which defendant objects is the one defining torture. The instruction states:

> "Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:
>
> "(a) extort anything from such person;
>
> "(b) or to persuade such person against his or her will, or
>
> "(c) to satisfy some other untoward propensity of the assailant * * *."

The term "untoward propensity" is defined in the same instruction as meaning "any perverse, wrong, bad or corrupt inclination or tendency." Defendant maintains that this instruction incorrectly defined torture.

A number of California cases have adopted a similar definition of torture. People v. Daugherty, (1953), 40 Cal.2d 876, 256 P.2d 911, 917 states:

"Murder is perpetrated by torture 'when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion or to satisfy some other untoward propensity." People v. Tubby, 34 Cal.2d 72, 77, 207 P.2d 51, 54; People v. Bender, 27 Cal.2d 164, 177, 163 P.2d 8.' People v. Martinez, 38 Cal.2d 556, 561, 241 P.2d 224, 227."

The language of the instruction proposed by defendant is an exact quotation from the opinion of an earlier California case, People v. Heslen, (1945), 163 P.2d 21, 27. See: 27 Cal.2d 520, 165 P.2d 250. That case dealt with the sufficiency of the evidence to support a finding of murder by torture and while there is no real conflict between the two instructions, the one given by the court is in the general language which does not comment on the evidence, which breaks the elements down, and which sets the various purposes out in the alternative is a clearer and more understandable statement of the law. The instruction given is a proper one and certainly the better of the two proposed instructions. People v. Wiley, (1976), 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881.

The District Court read 28 "Preliminary Instructions to the Jury" prior to trial. After trial, the court read Instructions 29 through 53, denominated "Additional Instructions". These instructions detailed the mental elements of each offense charged and instructed the jury regarding how these elements could be inferred or presumed from proven facts. The court also defined direct evidence, circumstantial evidence, inferences and presumptions and added additional instructions pertaining to evidence and credibility of witnesses. Instruction 30 stated that defendant is presumed sane, and Instruction 53 detailed the affirmative defense of disease or defect.

-27-

Defendant contends the use of statutory inferences and presumptions in the instructions was error and effectively shifted the burden of proof on the issue of intent to defendant.

In general, three statutory inferences and presumptions used in the instructions are in dispute. The presumptions that an unlawful act was done with an unlawful intent, and that a person intends the ordinary consequences of his voluntary act, were included in Instructions 33 ("Method of Proof Applicable to the Offense of Deliberate Homicide"), 37 ("Methods of Proof Applicable to Sexual Intercourse Without Consent") and 38 ("Methods of Proof Applicable to the Offense of Aggravated Assault"). Section 93-1301-7(2), (3), R.C.M. 1947. The inference in a deliberate homicide of knowledge or purpose from the fact the accused committed a homicide in the absence of circumstances of excuse, justification or mitigation appeared in Instruction 33. Section 95-3004(2), R.C.M. 1947.

As an example of how these inferences and presumptions were explained to the jury, Instruction 33 (I) and (II) is set out:

> "Method of Proof Applicable to the
> Offense of Deliberate Homicide
>
> "The mental state accompanying the voluntary act required for the offense of deliberate homicide being either knowingly or purposely and not requiring in addition thereto that the act be committed for a particular purpose, proof of the mental state may be made by the use of either inferences or presumptions, or by the use of both inferences and presumptions.
>
> "I.  Proof of Mental State by Inference.
>
> "If you find from the evidence beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, in the commission of a voluntary act, caused the death of Lana Harding, you are permitted from

that fact alone to deduce or reason that he did so either knowingly or purposely, if no circumstances of mitigation, excuse or justification appear in the evidence.

"You will be instructed on mitigation, excuse and justification if such instructions are needed.

"In addition to the fact of death being voluntarily caused by the accused, you may, and are instructed to also consider all the facts and circumstances connected with said death, that have been proved in the evidence in determining whether or not the defendant acted either knowingly or purposely.

"II. <u>Proof</u> <u>of</u> <u>Mental</u> <u>State</u> <u>by</u> <u>Presumptions.</u>

"(1) If you find beyond a reasonable doubt that the defendant, on about January 21, 1974, in Pondera County, Montana, voluntarily committed an illegal act on Lana Harding, such as assaulting or injuring her, the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose.

"This is a rebuttable presumption, which means it may be controverted and overcome by other evidence, but whether or not a presumption, once it has come into effect is overcome, is for the jury to determine.

"(2) The law also presumes that a person intends the ordinary consequence of his voluntary act.

"Therefore, if you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose.

"This also is a rebuttable presumption capable of being controverted and overcome, but once it has come into effect it is for the jury to determine whether or not it has been rebutted."

Defendant initially argues that Patterson v. New York, supra, and Mullaney v. Wilbur, (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L Ed 2d 508, stand for the proposition that

intent, as an element of the offense, may never be established by the use of presumptions. We disagree. The Supreme Court noted in Patterson:

> "Mullaney surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. * * *" 432 U.S. 215. (Emphasis added.)

Thus, an element of the offense may not be presumed merely by proof of the remaining elements. Elements of the offense may still be presumed or inferred, however, from proof of other facts, if the relationship between such proved facts and the facts presumed comports with the due process standards announced in Barnes v. United States, (1973), 412 U.S. 837, 93 S.Ct. 2357, 37 L Ed 2d 380. See, State v. McBenge, (1978), ____ Mont. ____, 574 P.2d 260, 35 St.Rep. 84, 91. The use of presumptions and inferences was recognized in a footnote to the majority opinion in Mullaney:

> "* * * Generally in a criminal case the prosecution bears both the production burden and the persuasion burden. In some instances, however, it is aided by a presumption, see Davis v. United States, 160 U.S. 469, 40 L Ed 499, 16 S Ct 353 (1895) (presumption of sanity), or a permissible inference, see United States v. Gainey, 380 U.S. 63, 13 L Ed 2d 658, 85 S Ct 754 (1965) (inference of knowledge from presence at an illegal still). These procedural devices require (in the case of a presumption) or permit (in the case of an inference) the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed or inferred fact by having satisfactorily established other facts. Thus, in effect they require the defendant to present some evidence contesting the otherwise presumed or inferred fact. See Barnes v. United States, 412 US 387, 846 n. 11, 37 L Ed 2d 380, 93 S Ct 2357 (1973). Since they shift the production burden to the defendant, these devices must satisfy certain due process requirements. See e.g., Barnes v. United States, supra; Turner v. United States, 396 US 398, 24 L Ed 2d 610, 90 S Ct 642 (1970).

"In each of these cases, however, the ultimate burden of persuasion by proof beyond a reasonable doubt remained on the prosecution. * * *" 421 U.S. 703, n. 31.

Our inquiry therefore is twofold: (1) Whether the inferences and presumptions in question satisfy the due process standards announced in Barnes; and (2) whether the cumulative effect of these instructions shifted the ultimate burden of persuasion on the issue of intent to defendant.

The Supreme Court in Barnes considered the relationship between the proven fact and the inferred or presumed fact that is required by due process and concluded:

"* * * What has been established by the cases, however, is at least this: that if a statutory inference submitted to the jury as sufficient to support conviction satisfies the reasonable doubt standard (that is, the evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt) as well as the more-likely-than-not standard, then it clearly accords with due process. " Barnes, 412 U.S. 843.

The presumptions that an unlawful act was done with unlawful intent, and that a person intends the ordinary consequences of his voluntary act, have been a part of Montana law since 1895. This Court has previously approved the use of these presumptions in criminal cases on the issue of intent. State v. Caryl, (1975), 168 Mont. 414, 426, 543 P.2d 389; State v. McLeod, (1957), 131 Mont. 478, 489, 311 P.2d 400, 407. See also, State v. Jones, (1963), 143 Mont. 155, 181, 387 P.2d 913. The conclusions drawn through the use of these presumptions are generally fair and reasonable ways to ascertain intent, which, of course, can never be proved directly. The instructions emphasized that the "unlawful act" proven must have been voluntary. We believe a rational juror would find beyond a reasonable doubt that a voluntary, unlawful act was done with an unlawful intent, and with an intent to cause its ordinary consequences.

-31-

The inference of knowledge or purpose in a deliberate homicide from the fact that the accused committed a homicide and that there are no circumstances of excuse, justification or mitigation is contained in section 95-3004(2), R.C.M. 1947. This statute was passed in 1973, at the same time the criminal code introduced the mental elements of knowledge and purpose. In order to qualify for the instructed inference that defendant acted purposely or knowingly, the State was still required to prove: (1) A voluntary act; (2) causing the death of the victim; and (3) absence of circumstances of excuse, justification or mitigation. The instruction emphasized the death must have been "voluntarily caused by the accused". This inference clearly comports with the "reasonable doubt" standard.

Defendant argues the cumulative effect of these presumptions and inferences shifts the burden of proof on the intent issue to defendant. It is well established that challenged jury instructions must be viewed in the context of the entire charge. Cupp v. Naughten, (1973), 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L Ed 2d 368; State v. Farnes, (1976), _____ Mont. _____, 558 P.2d 472, 33 St.Rep. 1270, 1275; State v. Bosch, (1952), 125 Mont. 566, 574, 242 P.2d 477. Defendant argues these presumptions and inferences gave the jury the impression that defendant must prove lack of intent. He fails, however, to consider that the following countervailing instructions were also given to the jury:

(1) That defendant denied every material allegation in every count by his plea, and therefore every material allegation must be proved beyond a reasonable doubt;

(2) That defendant is presumed to be innocent, and his guilt must be proven beyond a reasonable doubt;

-32-

(3) That the jury may not convict on possibilities, conjecture or surprise, but only on evidence establishing guilt beyond a reasonable doubt;

(4) The statutory definitions of the mental elements, "purposely" and "knowingly";

(5) A statement of the elements of the offenses charged, including the mental elements;

(6) A re-emphasis (in the "Additional Instructions") of the mental states required for each offense, and a re-emphasis of the requirement of a voluntary act; and

(7) Warnings that the presumptions noted may never be used to prove the particular purposes that are elements of the offenses of deliberate homicide by means of torture and aggravated kidnapping.

When read in their entirety, the instructions can only be interpreted to mean that the State had the burden of proving every element of the offense beyond a reasonable doubt.  The use of the presumptions and inferences merely set forth, in terms entirely consistent with Montana law, how the State could meet this burden by proof of objective facts.

We are aware of the recent decision in Oregon that to instruct the jury on the presumption of unlawful intent arising from an unlawful act constituted an unconstitutional shifting of the burden of proof on the element of intent from the state to defendant.  State v. Anderson, (1978), ____ Or. ____, 575 P.2d 677.  However, we reject the reasoning of that case.  In that case, unlike this one, "* * * the instructions, taken as a whole, were not clear on the issues of intent or burden of proof."  Anderson, 575 P.2d 679.  Here, the instructions on intent and burden of proof were clear and the jury was not misled by them.

In the context of this case, even if the instructions had erroneously shifted the burden of proof on the issue of intent to defendant, we question whether reversal would be required. Such an error could not have affected the jury's determination that it was defendant who caused the death of the victim. Evidence of the perpetrator's intent is overwhelming. The evidence we detailed in the beginning of this opinion about the cause of death, the defendant's behavior on the days prior to the attack, and the facts and circumstances following the attack, all show that defendant acted "purposely" or "knowingly".

A psychiatrist, Dr. Robert Wetzler, testified for the defense that if defendant did the acts charged in the Information, he suffered from such a mental disease or defect that he could not have acted "purposely" or "knowingly". This testimony must be considered in light of the fact that Dr. Wetzler made no inquiry into defendant's actions or statements on the night of the attack or the two days immediately preceding it, although he admitted that such factors could have some bearing upon defendant's mental capacity when the offense was committed. Another psychiatrist, Dr. M. F. Gracia, and a psychologist, Dr. Edmund W. Shubat, both expressed the opinion that defendant did have capacity to act "purposely" or "knowingly".

Furthermore, taking into account all the evidence, we are convinced beyond a reasonable doubt that defendant acted "purposely" or "knowingly" and therefore, even if there was any error in the burden of proof, it was harmless. Chapman v. California, (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L Ed 2d 705.

Defendant goes on to claim error because his instructions were not given. This argument must fail. Defendant's instructions on mental state and mental disease and defect misstate the law, and the instructions on the elements of the crimes charged add an element that is not required.

We have carefully examined the court's instructions and find them proper. The court's instructions as a whole correctly state the law.

The next argument defendant raises is that the verdict forms provided to the jury did not cover all possible verdicts and that they amount to special verdicts.

Defendant submitted instructions and verdict forms which covered the offenses of mitigated deliberate homicide and unlawful restraint. It is clear, as stated in State v. Gray, (1968), 152 Mont. 145, 153, 447 P.2d 475,479:

> "* * * 'The submission of a lower offense is justified only when the evidence on some basis would support a finding that the defendant is innocent of the higher offense and guilty of the lower.' * * *"

See also: State v. McDonald, (1915), 51 Mont. 1, 149 P. 279; State v. Baugh, (1977), ____ Mont. ____, 571 P.2d 779. 34 St.Rep. 1315. In this case there was no such evidence and the instructions and verdict forms on the lesser offenses were properly not given.

Defendant claims error in that the verdict forms submitted/the jury were special verdicts. He argues that Montana law does not allow for specific factual findings by the jury.

The jury was given general verdicts asking for a finding of guilty or not guilty on each count. The jury was to make the additional finding that the element necessary for the imposition of the death penalty was present. Under those

circumstances, this additional factual finding does not fall into the vice of a special verdict. It does not require a fact determination which could be used to undermine the general verdict. Thus, the verdict forms were permissible.

Defendant claims prejudicial error in the court's permitting the audience to tape record the State's closing argument to the jury. He contends this prejudiced his right to a fair trial. His argument is that the jury was influenced by the argument being recorded because the jury could believe, under those circumstances, there was something worth preserving.

In his brief, defendant admits that the court's failure to prohibit the recording of the argument violates no statute. He cites no case law that is violated. He admits the Canons of Judicial Ethics, which have been adopted by this Court, do not specifically deal with this question. He does say that the Code of Judicial Conduct prohibits such recording. However, that Code has not been adopted in Montana. Thus, no law or rule of this Court was violated by the audience's tape recording the argument.

As to defendant's argument that it prejudiced his right to a fair trial, we find no merit in that claim. The rule is that before a judgment in a criminal case will be reversed, prejudice must be shown. State v. Totterdell, (1959), 135 Mont. 56, 336 P.2d 696. The defendant must demonstrate prejudice from the record. State v. Schleining, (1965), 146 Mont. 1, 403 P.2d 625. Defendant has not demonstrated he was prejudiced by the recordings of the closing argument. His right to a fair trial was neither denied nor invaded.

Defendant alleges error because he had to make an out-of-order presentation of his case-in-chief during the State's case-in-chief. The usual order of trial may be departed from

in the proper case. Section 95-1911, R.C.M. 1947 states:

> "When the state of the pleading requires it,
> or in any other case, for good reasons, and in
> discretion of the court, the order prescribed
> in the last section may be departed from."

We note that the artful phrase "good cause" is not used, rather there must be "good reasons" for the departure of the usual order of the trial.

Defendant's difficulty arose from the fact the FBI agents who were to testify in this case were scheduled to testify in several other cases in other states and the judge would not require them to remain for the duration of the trial, nearly three weeks, unless there was good reason to keep them. The court requested defendant make an offer of proof to show why these persons should not be released from their subpoenas after defendant opened his case-in-chief. Defendant argued that no reasonable offer of proof could be made until the completion of the State's case-in-chief. This may well have been true prior to enactment of the liberal discovery procedures in the Code of Criminal Procedure. In the present case, however, defendant had examined the FBI reports; he had examined the physical evidence; and he had a list of the proposed exhibits that were to be put into evidence. If there was some reason to require the FBI agents to remain, defendant would know it at the time of trial. No showing of such need was made and the judge in a proper exercise of his discretion and for good reasons allowed the agents to leave after they had testified as part of the defendant's case-in-chief, in the middle of the State's case-in-chief.

Defendant further alleges error because his expert on mental defect or disease was not allowed to be present during the State's presentation of its rebuttal experts on

this matter. Earlier in the trial, defendant sought a ruling from the court that all witnesses be excluded from the courtroom when other witnesses were testifying. The court granted this motion except the court said that the exclusionary rule did not extend to rebuttal witnesses. Defendant's expert was a witness in his case-in-chief. After defendant rested, he sought permission from the court to have this expert present in the courtroom during the testimony of the State's rebuttal experts. The court refused to grant such permission. Defendant alleges this was an abuse of discretion which prejudiced defendant.

We are unconviced the court abused its discretion. Defendant's expert was a witness in his case to whom the exclusionary rule applied. The fact that defendant wanted to use him as a rebuttal witness did not except him from the exclusionary rule defendant had asked the court to invoke. Nor do we see that defendant was prejudiced by the court's action. The State's rebuttal experts' testimony concerned the report they had made on defendant's mental disease or defect. These were reports that the defense had been supplied with, as required by section 95-505(5), R.C.M. 1947. The State's witnesses finished at the end of the day and defendant's rebuttal began the next day. There was time then to inform the defense expert of any additional information not in the report made by these experts, and to prepare rebuttal testimony. Under those circumstances, defendant was not prejudiced.

Defendant argues the evidence is insufficient to justify the verdicts rendered against him. He specifically argues that the evidence is insufficient to support the verdicts that defendant committed deliberate homicide by torture and

that as a result of her aggravated kidnapping, Lana Harding died.

In State v. Fitzpatrick, (1973), 163 Mont. 220, 226, 516 P.2d 605, this Court set forth its position in determining questions of sufficiency of the evidence:

"As this Court has held many times over, the jury is the fact finding body in our system of jurisprudence, and its decision is controlling. The jury is free to consider all the evidence presented and to pick and choose which of the witnesses it wishes to believe. If sufficient testimony was introduced, as well as exhibits to justify the jury's findings, then its conclusion will not be disturbed unless it is apparent there was a clear misunderstanding by the jury or that there was a misrepresentation made to the jury."

In this case, the evidence presented to the jury did not mislead them, nor was any of it ever misrepresented to them. The evidence was sufficient to justify the jury's finding that Lana Harding was killed by means of torture and that she died as a result of her aggravated kidnapping by defendant.

The rule is that if substantial evidence is found to support the verdict, it will stand. State v. White, (1965), 146 Mont. 226, 405 P.2d 761; State v. Stoddard, (1966), 147 Mont. 402, 412 P.2d 827. Such is the case here.

Defendant alleges error in the trial court's denial of his motion for a new trial. He contends he was entitled to a new trial due to insufficiency of the evidence. He further argues that the cumulation of errors committed in his trial denied him a fair trial.

Since we have held that the evidence was sufficient to sustain defendant's conviction, we further hold the court did not err in denying the motion for new trial.

We find no merit in defendant's argument on cumulative error. Since we have held that no substantial errors were committed, we do not believe the doctrine of cumulative error applies. We are unconvinced that the concepts of "harmless error" and "cumulative error" are interrelated. "Harmless error" refers to technical errors, which do not require reversal. State v. Gallagher, (1968), 151 Mont. 501, 445 P.2d 45. "Cumulative error" refers to a number of errors which prejudice defendant's right to a fair trial. State v. Meidinger, (1972), 160 Mont. 310, 502 P.2d 58. Having found that no substantial errors were committed by the trial court, we hold that the doctrine of cumulative error does not apply and a new trial will not be ordered.

Defendant asserts that the trial court erred by basing its judgment and sentence upon erroneous findings, conclusions, sentence and order. He further argues the death penalty imposed as a sentence by the trial court is unconstitutional under the United States Constitution and the 1972 Montana Constitution.

As to the errors in the court's findings, conclusion, sentence and order, the errors referred to are essentially clerical errors in the body of that document. A mistaken citation of subsection letter in section 94-5-105, R.C.M. 1947, which was caused by the amendment which numbered the section, is an example. This document is not in error with respect to the factual or legal basis of its findings. This Court finds no prejudice in the clerical errors.

Defendant was sentenced to death for his conviction of the offenses of deliberate homicide and aggravated kidnapping. This sentence was imposed by virtue of sections 94-5-105 and 94-5-304, R.C.M. 1947. At the time of the crimes, these statutes read:

"94-5-105. Sentence Of Death For Deliberate Homicide.

"(1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

"(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

"(b) The defendant was previously convicted of another deliberate homicide; or

"(c) The victim of the deliberate homicide was a peace officer killed while performing his duty; or

"(d) The deliberate homicide was committed by means of torture; or

"(e) The deliberate homicide was committed by a person lying in wait or ambush; or

"(f) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person."

"94-5-304. Sentence of Death for Aggravated Kidnapping.

"A Court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct unless there are mitigating circumstances."

These sections were enacted in 1973, and became effective on January 1, 1974. In 1974, section 94-5-304 was amended by Ch. 126, §1, Laws of 1974, to read:

"94-5-304. Sentence of death for aggravated kidnapping. A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct."

This amendment deleted the phrase: "unless there are mitigating circumstances." The amendment had an effective date of March 11, 1974. At the time of the death of Lana Harding, this amendment was not in effect. Therefore, our analysis of the constitutionality of these death penalty statutes will concern them as they existed at the time of the crimes involved in this case.

The death penalty statutes in question here were adopted in response to Furman v. Georgia, (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L Ed 2d 346. In Furman, the Supreme Court reversed and vacated death sentences imposed on three defendants. It was a per curiam opinion, with five separate concurrences and four separate dissents. The five concurring opinions each asserted different theories for finding the statutes in question unconstitutional. Essentially, the fatal flaw in the death penalty, under the concurring opinions of Furman, was the absence of consistent application of the sanction.

The cumulation of majority opinions in Furman led to considerable confusion among the several states' legislatures which desired to retain a constitutionally viable death penalty, i.e., a death penalty that was being imposed consistently and not arbitrarily. In some jurisdictions Furman was read as requiring a strictly mandatory death sentence for certain classes of proven crimes. In other jurisdictions, Furman was read as attacking unbridled discretion rather than discretion per se. These states passed statutes to control the discretion of the sentencing authority. These statutes allowed the death penalty to be imposed only when unmitigated aggravating circumstances were present.

In 1976, the United States Supreme Court considered the constitutionality of mandatory death penalty statutes. Woodson v. North Carolina, (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L Ed 2d 944. The statute before the Court was North Carolina's death penalty statute. It provided a death sentence for all persons convicted of first degree murder. The Supreme Court held the statute unconstitutional as violative of the Eighth and Fourteenth Amendments. In two

later cases, the Supreme Court also held mandatory death penalty statutes unconstitutional. Coker v. Georgia, (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L Ed 2d 982; Harry Roberts v. Louisiana, (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L Ed 2d 637. The problem with mandatory death penalty statutes, according to the Court, was:

> "* * * it is essential that the capital sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or particular offense. * * *" Harry Roberts, 431 U.S. 637.

The death penalty statutes under attack in the instant case, sections 94-5-105 and 94-5-304, as they existed at the time of the crimes, are not mandatory death penalty statutes. Thus, they can withstand scrutiny under the decisions of Woodson, Coker, and Harry Roberts because they allow for consideration of mitigating circumstances.

Also in 1976, the Supreme Court considered the constitutionality of those death penalty statutes that controlled the discretion of the sentencing authority. Unlike their mandatory counterparts, the Court upheld these statutes. Gregg v. Georgia, (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L Ed 2d 859; Proffitt v. Florida, (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L Ed 2d 913; and, Jurek v. Texas, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L Ed 2d 929. In Gregg the Supreme Court stated:

> "Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricous action." 428 U.S. 189.

The Montana statutes defendant challenges are designed to control the discretion of the sentencing authority. These statutes are in the constitutionally permissible

ground between unbending mandatory death sentences and unbridled discretion in the imposition of the death penalty.

In its decisions of Gregg, Jurek and Proffitt, the United States Supreme Court seems to have established three general criteria which are requisite to a valid death penalty statutory scheme.

First, there must be at least one statutory aggravating circumstance before a death sentence may be considered. Second, the defense must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there must be available prompt judicial review of the sentencing decision by a court of state-wide jurisdiction, providing a means to promote the evenhanded, rational and consistent imposition of death sentences under the law.

Sections 94-5-105 and 94-5-304 satisfy the first criterion set forth above. Under section 94-5-105, the death penalty cannot be imposed unless one of six aggravating circumstances is found by the trier of fact to exist. Here, it was found that defendant committed deliberate homicide by means of torture. Section 94-5-105(1)(d), R.C.M. 1947. Under 94-5-304, the death sentence cannot be imposed unless it is found the kidnap victim died as a result of the aggravated kidnapping. Such a finding was made in this case by the jury.

The second criterion, that mitigating circumstances be reviewed at a separate sentencing hearing, is satisfied by two separate statutory provisions: First, both death penalty statutes provide that the court "shall" impose a sentence of death "unless there are mitigating circumstances". Defendant urges the "unless" clause may purport to circumscribe the

sentencing judge's authority, but there are no guiding standards nor sources of information provided for. This argument ignores the second statutory provision relevant here--that is, the presentence investigation report to be delivered to and considered by the sentencing court in felony cases. Section 95-2204, R.C.M. 1947, provides the report shall contain information respecting "the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; * * * and the harm to the victim, his immediate family, and the community." The report provides the sentencing authority with whatever circumstances may exist in mitigation of the defendant's conduct.

Reading the two provisions together, the sentencing court is required to consider mitigating circumstances and is required to consider the presentence investigation report which must contain any matters relevant to mitigation. In addition, all sentencing courts are directed by section 95-2201, R.C.M. 1947, to perform their sentencing functions "to the end that persons convicted of a crime shall be dealt with in accordance with their individual characteristics, circumstances, needs and potentialities". This mandates the imposition of sentences which are not disproportionate to the severity of the crime. Finally, the defendant is authorized to seek a hearing to present to the court his testimony and evidence in mitigation of punishment.

Prompt judicial review of death sentences is provided for by appeal to this Court as well as review to the Sentence Review Division. This Court determines the legality of the sentence imposed, State v. Simtob, (1969), 154 Mont. 286,

462 P.2d 873, while the Sentence Review Division is designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense. This satisfies the third criteria.

Although Montana's statutory scheme is unlike those approved by the United States Supreme Court in Gregg, Proffitt, and Jurek, we see no substantive failure of Montana's statutory scheme to comply with constitutional standards. Our system is neither wholly mandatory nor wholly discretionary. There are precise statutory requirements for finding aggravating and mitigating circumstances, and a procedure for flushing out the facts with respect to such circumstances. There is appellate review at two levels, insuring that the sentence is both legal and proportional to the nature and class of crime. In short, we believe that the Montana statutory scheme in existence at the time of the crimes herein, affords defendant the procedural safeguards necessary to protect his substantive rights to be sentenced without arbitrariness or caprice.

Therefore, we hold that the death penalty statutes in question in this case are constitutional under the United States consitutional requirements. They are constitutional on their face and as applied to this defendant.

Defendant next contends that shifting the burden of proving insanity to the defendant offends the due process clause of the Montana Constitution.

Defendant relies on the reasoning of a Colorado case, State ex rel. Juhan v. District Court, (1968), 165 Colo. 253, 439 P.2d 741. Prior to Juhan, the Colorado Supreme Court had always held the burden was on the state to disprove a properly raised defense of insanity beyond a reasonable

-46-

doubt. The legislature subsequently passed a statute purporting to shift the burden to defendant. The Colorado Supreme Court in Juhan, in a 3-2 decision, held its previous decisions were interpretations of the due process clause of the Colorado Constitution, and therefore the legislature was powerless to vary the constitutional ruling by legislative enactment.

Defendant's reasoning is similar. In 1895, the United States Supreme Court held that in the federal system, the burden was on the state to disprove insanity beyond a reasonable doubt. Davis v. United States, (1895), 160 U.S. 469, 16 S.Ct. 353, 40 L.ed. 499. Three Montana cases decided shortly thereafter adopted the Davis rule for Montana. State v. Brooks, (1899), 23 Mont. 146, 57 P. 1038; State v. Peel, (1899), 23 Mont. 358, 59 P. 169; State v. Felker, (1903), 27 Mont. 451, 71 P. 668. The Montana Legislature in 1925 passed Ch. 87, Laws of 1925, imposing the burden on defendant to prove his insanity by a preponderance of the evidence. This became subsection 2 of former section 94-119, R.C.M. 1947. The present statute, passed in 1967, is section 95-503, R.C.M. 1947. Thus, the burden has remained on the defendant since 1925. Montana cases since 1925 have relied upon the statute and held the jury should be instructed that defendant must prove insanity by a preponderance of the evidence. State v. Vettere, (1926), 76 Mont. 574, 248 P. 179. The main thrust of defendant's argument is that the old Montana cases were of constitutional significance and could not be varied by the legislature; thus Montana's statutes have violated the due process clause of the Montana Constitution since 1925.

The problem with this argument is that it assumes
Brooks, Peel, and Felker were based on the due process
clause of the Montana Constitution.  There is no mention of
the Montana Constitution in any of them.  They merely fol-
lowed the rule announced by the Supreme Court in Davis.  The
Supreme Court in Leland v. Oregon, (1952), 343 U.S. 790, 72
S.Ct. 1002, 96 L.ed 1302, noted that Davis "obviously estab-
lishes no constitutional doctrine, but only the rule to be
followed in federal courts."  Similarly, it is apparent that
Brooks, Peel and Felker were not establishing a constitutional
doctrine for Montana.  Just as Congress could conceivably
change the federal rule set forth in Davis, the Montana
Legislature clearly had the power to change the rule announced
in the early Montana cases.

On remand from the United States Supreme Court, the
issue before this Court is whether the trial court's instruc-
tion on mental disease or defect unconstitutionally shifted
the burden of proof of state of mind to defendant.  The
Supreme Court directed us to reconsider our early decision
in this case in light of Patterson v. New York, (1977), 432
U.S. 197, 97 S.Ct. 2319, 53 L Ed 2d 281.  In doing so, we
will examine the defense of mental disease or defect as it
exists under Montana law and as applied in this case.

Evidence of a defendant's mental disease or defect is
admissible in Montana criminal trials for two statutory
defenses. Section 95-501(a), R.C.M. 1947, provides:

> "A person is not responsible for criminal con-
> duct if at the time of such conduct as a result
> of mental disease or defect he is unable either
> to appreciate the criminality of his conduct
> or to conform his conduct to the requirements
> of law."

This section defines Montana's "legal insanity" defense.
Section 95-503(a), R.C.M. 1947, places upon the defendant
the burden of establishing his legal insanity by a pre-
ponderance of the evidence. Defendant concedes the State
may allocate to the defendant the burden of proving his
legal insanity without violating the United States Constitu-
tion. Patterson v. New York, supra; Rivera v. Delaware,
(1976), 429 U.S. 877, 97 S.Ct. 226, 50 L Ed 2d 160; Leland
v. Oregon, supra. Defendant contends, however, that the
second criminal defense involving mental disease or defect
unconstitutionally shifted the burden to defendant to dis-
prove intent, an essential element of the crime charged.

In addition to the legal insanity defense which, if
proven, excludes a defendant's responsibility for an other-
wise criminal act, evidence of a defendant's mental disease
or defect is also admissible in Montana criminal trials " *
* * whenever it is relevant to prove that the defendant did
or did not have a state of mind which is an element of the
offense." Section 95-502, R.C.M. 1947. This section is a
codification of the "diminished capacity" defense, under
which a defendant may show that he suffered from a mental
disease or defect which, although insufficient to establish
legal insanity as a complete defense, made him incapable of
forming the criminal intent defined by statute as an element
of the crime charged.

In 1967, when section 95-502, R.C.M. 1947, was enacted
by the Montana legislature, homicide in Montana was divided
into four classifications, each requiring a different and
specific mental state. The intent element of first degree
murder was deliberation, premeditation and malice afore-
thought, while that of second degree murder was malice

-49-

aforethought, without deliberation or premeditation. Section 94-2503, R.C.M. 1947. State v. Brooks (1967), 150 Mont. 399, 436 P.2d 91. Voluntary manslaughter consisted of any unlawful killing, without malice, upon a sudden quarrel or heat of passion. Section 94-2507(1), R.C.M. 1947. Involuntary manslaughter, the fourth classification of homicide under Montana criminal law in 1967, did not have criminal intent as a statutory element of the crime; the issue, rather, was one of criminal negligence. Section 94-2507(2), R.C.M. 1947. State v. Souhrada, (1949), 122 Mont. 377, 204 P.2d 792.

The diminished capacity defense was traditionally used to show that, due to mental disease or defect, the defendant was unable to form the specific intent which was an element of a higher degree of an offense such as homicide, and that a lesser degree of criminal homicide, which lacked that specific intent as an element of the crime, was in fact committed. See, Anno. 22 ALR3d 1228, 1238-43 (1968). Thus, under Montana law in effect when section 95-502, R.C.M. 1947, was enacted, evidence of a defendant's mental disease or defect was admissible to prove or disprove, for example, that, although a defendant committed an unlawful killing with malice aforethought, he had not the capacity to form the specific intent--deliberation or premeditation--which was an element of first degree murder.

By January 1974, when Lana Harding was kidnapped and murdered, Montana had adopted its present criminal code. The new code abolished all distinctions between first and second degree murder. Malice aforethought and premeditation are no longer elements of the criminal homicide offense. The intent element of the crime of homicide under present

Montana law is merely "purposely, knowingly, or negligently" causing the death of another human being. Section 94-5-101, R.C.M. 1947. There are three types of criminal homicide. Defendant was charged with, and convicted of, deliberate homicide, a criminal homicide committed purposely or knowingly. Section 94-5-102(1)(a), R.C.M. 1947. Mitigated deliberate homicide, a lesser offense, also requires that the defendant commit the criminal homicide purposely or knowingly, but that the deliberate homicide be committed under the influence of extreme mental or emotional stress for which there is a reasonable excuse. Section 94-5-103(1), R.C.M. 1947. The third type of criminal homicide, negligent homicide, is inapplicable to the facts shown at trial.

Because the statutory definitions of both deliberate homicide and mitigated deliberate homicide require proof by the State of the identical mental element--purposely or knowingly--there was no lesser degree of criminal homicide of which defendant could have been convicted upon proof that he was unable to form the mental state required in deliberate homicide. The State concludes that, because all of the charges required a showing of purposeful or knowing conduct, the section 95-502 defense of mental disease or defect negating the ability to form a purposeful or knowing intent was a complete, rather than a partial, defense and as such merged with the insanity defense of section 95-501.

We do not agree with the State that, in this case, the diminished capacity and insanity defenses were necessarily identical. The prescribed mental state of "purposely or knowingly" applies to each element of the crime of deliberate homicide. Section 94-2-103(1) and (2), R.C.M. 1947. To be guilty of deliberate homicide, therefore, one must either

-51-

have the purpose to kill or know that it was highly probable that his actions would result in the death of another human being.  While legal insanity would have completely exonerated defendant from responsibility for his criminal conduct, the diminished capacity defense could be used in a criminal homicide case to show, for example, " * * * that although defendant knew the nature and quality of the act (the assault * * *) and knew that it was wrong" and so was not irresponsible under the legal insanity test, "he lacked mental capacity to form the intent to kill * * *".  Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959, 979-80 (1948).  A defendant then, due to mental disease or defect precluding him from forming the intent to commit criminal homicide, might be found guilty of the lesser included offense of aggravated assault.  See, State v. Booth, (1977), 30 Or.App. 351, 567 P.2d 559, 561-62.

Defendant maintains the State was required to prove " * * * that defendant had, and could have had, a particular state of mind which is an element of the offense", and that by making diminished capacity an affirmative defense, the trial judge unconstitutionally shifted to defendant the burden of disproving an essential element of the offenses charged.

> "* * * the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L Ed 2d 368.

We must therefore analyze Montana's deliberate homicide statute to determine if a defendant's lack of mental disease or defect, and his resulting ability to purposely or knowingly cause the death of another person, is a fact necessary

to constitute the crime charged. Patterson v. New York, supra.

In Montana, a person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. Sections 94-5-102(1)(a), 94-5-101(1), R.C.M. 1947. The statutorily defined elements of the offense, each of which the State must prove beyond a reasonable doubt, are therefore causing the death of another human being with the knowledge that you are causing or with the purpose to cause the death of that human being. A person acts "with knowledge" or "knowingly" " * * * with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct. * * *" Section 94-2-101(27), R.C.M. 1947. The statute does not require the State to prove the defendant does not suffer from mental disease or defect which would prevent the defendant from doing the act purposely or knowingly.

Because sanity or lack of mental disease or defect is not an element included in the definitions of any of the crimes charged against defendant, the State may rely upon the rebuttable presumption that the defendant was sane when the offense was committed. Cf. Mullaney v. Wilbur, (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L Ed 2d 508; see, Patterson v. New York, 432 U.S. 212-216. The sanity presumption is a presumption which all the states employ in criminal trials. See, H. Weihofen, Mental Disorder as a Criminal Defense, (1954), pp. 214-215, and cases collected therein; Leland v. Oregon, 343 U.S. at 799. Without a presumption that everyone is sane and capable of committing crimes, " * * * the government would always be under the necessity of adducing

-53-

affirmative evidence of the sanity of the accused. But a requirement of that character would seriously delay and embarrass the enforcement of the laws against crime, and in most cases be unneccessary. * * *" Davis v. United States, (1895), 160 U.S. 469, 486, 16 S.Ct. 353, 40 L.ed. 499. The trial court instructed the jury defendant was presumed to have been sane at the time the offenses were committed. Defendant himself in his requested instructions stated that "Every man is presumed to be sane, that is, to be without mental disease or defect * * * ." The presumption of sanity did not shift to defendant the burden of disproving a fact necessary to constitute the crime charged.

> "* * * To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue * * * .
>
> "* * * Proof of the nonexistence of all affirmative defenses has never been constitutionally required * * *." Patterson v. New York, 432 U.S. 209, 210.

The section 95-502, diminished capacity defense, is an affirmative defense. Section 94-2-103(6), R.C.M. 1947. To rebut the presumptions of sanity and capability of forming a purposeful or knowing intent, a defendant may admit evidence relevant to " * * * prove that he did not have a particular state of mind which is an essential element of the offense charged." Section 95-503(b)(2), R.C.M. 1947. These sections do not define the standard of proof necessary to establish this affirmative defense, and neither section 95-502 nor section 95-503(b)(2) has been interpreted by this Court. We hold that, to prove a section 95-502 defense, a defendant must prove by a preponderance of the evidence that he lacked the ability, due to mental disease or defect, to form that criminal mental state which is defined by statute as an element of the crime with which he is charged.

Placing on a defendant the burden of proving the diminished capacity defense does not offend " * * * 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' * * *" Speiser v. Randall, (1958), 357 U.S. 513, 523, 78 S.Ct. 1332, 2 L Ed 2d 1460. Several jurisdictions do not even allow diminished capacity as an affirmative defense. See, State v. Doss, (1977), 116 Ariz. 156, 568 P.2d 1054; Bethea v. United States, (App.D.C. 1976), 365 A.2d 64; cases collected in 22 ALR3d 1228, 1235-1238. Indeed, in the sole opinion in which the Supreme Court considered whether a trial court must instruct jurors that they should consider evidence of diminished capacity, the Court held that this was a matter of peculiarly local concern entrusted to the local courts.

> "* * * For this Court to force the District of Columbia to adopt such a [diminished capacity] requirement for criminal trials would involve a fundamental change in the common law theory of responsibility."
> Fisher v. United States, (1946), 328 U.S. 463, 476, 66 S.Ct. 1318. 90 L.ed. 1382. (Bracketed material added.)

Because psychiatric evaluation as to subtle gradations of mental impairment is highly subjective and not within the common experience of the layman juror, the State may in fairness require a defendant to convince the jury of his diminished capacity by a preponderance of the evidence.

The fact that psychiatry is a developing and, at present, inexact science has long been noted by the courts. See, Greenwood v. United States, (1956), 350 U.S. 366, 76 S.Ct. 410, 100 L.ed. 412; Warhlich v. Arizona, (9th Cir. 1973), 479 F.2d 1137; Bethea v. United States, supra.

> "The science of psychiatry is at most an
> educated guess as to the certainty of human
> behavior, which cannot be predicted with
> any absoluteness. * * *" People v. Del
> Guidice, (1973), 345 N.Y.S.2d 341, 344.

In rejecting the diminished capacity defense, courts have
also compared diminished capacity with other defenses and
noted:

> "* * * unlike the notion of partial or
> relative insanity, conditions such as intoxi-
> cation, medication, epilepsy, infancy, or
> senility are, in varying degrees, susceptible
> to quantification or objective demonstration,
> and to lay understanding. * * *"  Bethea v.
> United States, 365 A.2d 88.

See, Wahlrich v. Arizona, supra; State v. Doss, supra.

The myriad problems with allowing the introduction of
psychiatric testimony to determine criminal responsibility
are discussed in Ennis & Litwack, Pyschiatry and the Pre-
sumption of Expertise:  Flipping Coins in the Courtroom, 62
Cal. L.Rev. 693, 737 (1974).

Despite the potential problems of proof in allowing the
diminished capacity affirmative defense, and despite the
fact that a state very likely is not constitutionally re-
quired to even allow diminished capacity as an affirmative
defense, Montana does allow the defense.  While the Montana
legislature was willing to recognize diminished capacity:

> " * * * as an exculpatory * * * circumstance
> affecting the degree of culpability * * * it
> was willing to do so only if the facts making
> out the defense were established by the de-
> fendant with sufficient certainty.  The State
> was itself unwilling to undertake to establish
> the absence of those facts beyond reasonable
> doubt, perhaps fearing that proof would be
> too difficult and that too many persons de-
> serving treatment as murderers would escape
> that punishment if the evidence need merely
> raise a reasonable doubt about the defend-
> ant's [diminished capacity]. * * *" Patterson
> v. New York, 432 U.S. 207.

In this case, the State meticulously proved the facts constituting the deliberate homicide and aggravated kidnapping crimes beyond any reasonable doubt, based on all the evidence including the evidence of defendant's alleged mental disease or defect. The State, consistent with the Leland and Rivera cases, could then constitutionally refuse to sustain the affirmative defense of diminished capacity unless defendant proved that defense by a preponderance of the evidence.

The instructions given by the court clearly required the State to prove every element of the offenses charged beyond a reasonable doubt and more than gave defendant the benefit of Montana law on the diminished capacity defense burden of proof. In Instruction 53 the jurors were told that, before considering the diminished capacity defense, they were to " * * * first determine from the evidence in the case beyond a reasonable doubt whether the defendant did do the acts charged against him in the Information." The court separately instructed the jury that to find defendant guilty of any of the offenses charged, they must first find that defendant " * * * committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in the said definition". (Instruction 29.) The court instructed the jury that only if it found beyond a reasonable doubt that defendant did any of the acts charged against him in the Information should they then consider "whether or not he could have had the requisite mental state for the act or acts which you have found he committed." (Instruction 53.)

Although the court in Instruction 53 instructed the jury as to defendant's burden of proof for his legal insanity defense, nowhere in the instruction itself did the court specifically instruct the jury as to what burden of proof defendant had to satisfy to establish that he could not form a mental state of "purposely" or "knowingly" due to mental disease or defect (the diminished capacity defense). It is well established, however, that "* * * a single instruction is not viewed in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, (1973), 414 U.S. 141, 146-47, 94 S.Ct. 396, 38 L Ed 2d 368. If all the instructions considered as a whole fairly and accurately present the case to the jury, the fact that one instruction, standing alone, is not as full as it might have been is not reversible error. State v. Brooks, (1967), 150 Mont. 399, 436 P.2d 91. Instruction 1 in this case made the jury aware of this rule of law. " * * * you are to consider all of the instructions as a whole, and are to regard each in the light of all the others."

The instructions in this case, when considered as a whole, imposed a more lenient burden of proof on defendant than Montana law provided, because the instructions impressed upon the jury that defendant had successfully established his diminished capacity defense if, after considering all the evidence in the case, the jurors entertained a <u>reasonable doubt</u> as to whether defendant suffered from mental disease or defect which prevented him from forming a purposeful or knowing state of mind with respect to the offenses charged.

> "A person to be guilty of any of the offenses charged in any of the seven counts charged in the Information must have committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in said definition. " (Instruction 29)

"* * * In order to convict the defendant of the offense charged in any of said counts all of the material allegations contained in that particular count must be proved beyond a reasonable doubt * * *." (Instruction 6)

"Reasonable doubt is * * * that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." (Instruction 7)

The instructions which were given to the jury in this case not only protected defendant within the ambit of Montana law, but indeed posited a more liberal burden of proof than that to which defendant was entitled. Not only did the instructions not shift to defendant the burden of disproving any element of the offenses charged, but the instructions, when read together, also required defendant to establish his diminished capacity merely by raising a reasonable doubt, rather than by proof by a preponderance of the evidence.

In summary, we have examined all the specifications of error raised by defendant and find no reversible error. We have further considered this case in light of Patterson v. New York, supra, in accordance with the mandate of the United States Supreme Court on remand, and find no error.

The judgment of conviction and the sentence of death are affirmed.

_____
Chief Justice

We Concur:

_____
Justice

_____
Hon. W. W. Lessley, District
Judge, sitting for Mr. Justice
Harrison

I dissent and will file a
written dissent shortly.

_____
Hon. Jack D. Shanstrom, District
Judge, sitting in the vacant seat
on the Court.

_____
Justice

-59-